ASSEMBLY OF the STATE OF CALIFORNIA; Honorable Willie L. Brown, Jr., Speaker of the Assembly of the State of California; Honorable Peter R. Chacon, Chairman, Assembly Committee on Elections, Reapportionment & Constitutional Amendments of the Assembly of the State of California, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF COMMERCE, Defendant.

No. Civ. S-91-990 WBS/JFM.

United States District Court, E.D. California.

Feb. 10, 1992.

Charles C. Marson, Barbara A. Brenner, Joseph Remcho, Remcho, Johansen & Purcell, San Francisco, Cal., for plaintiffs.

Elizabeth Pugh, John R. Niemeyer, Stuard M. Gerson, U.S. Dept. of Justice, Washington, D.C., Yoshinori H.T. Himel, Joyce Vermeersch, Asst. U.S. Attys., Sacramento, Cal., for defendant.

## MEMORANDUM AND ORDER

SHUBB, District Judge.

This is an action brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 to enjoin the United States Department of Commerce from withholding certain census data and for declaratory relief. The matter is before the court on cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. Federal Jurisdiction is predicated on 5 U.S.C. § 552(a)(4)(B). The sole issue for consideration is whether the defendant properly relied upon Exemption 5 of the FOIA in withholding computer tapes containing block level adjusted census data for the State of California ("the requested tapes"). Because the court concludes as a matter of law that defendant has not sustained its burden of proving that the tapes were exempt from disclosure, plaintiffs' motion for summary judgment is granted and defendant's is denied.

## I. THE CASE

### A. *The Post–Enumeration Survey*

To place this controversy in some context, it is necessary to provide background for the adjustment dispute. The numerical data contained on the requested tapes is derived from a Post–Enumeration Survey ("PES") conducted by the Bureau of Census in connection with the 1990 census. In simple terms, the PES had four distinct phases. *See* Decl. of Mark Plant in Opposition to Plaintiff's Motion for Preliminary Injunction at 6–8; *see also Decision of the Secretary of Commerce on Whether a Statistical Adjustment of the 1990 Census of Population and Housing Should be Made for Coverage Deficiencies Resulting an Overcount or Undercount of the Population*, 56 Fed.Reg. 33582 (1991). The first phase was the actual enumeration, or traditional count of the population. *See* Plant at ¶ 6. According to the Secretary of the Department of Commerce the official census counted about 98% of all people living in the United States. *See Decision*, 56 Fed.Reg. at 33582. However, census participation and coverage was lower than average among certain segments of the population. *Id.* Based on the Department's estimates, "Blacks appear to have been undercounted in the 1990 census by 4.8%, Hispanics by 5.2%, Asian Pacific Islanders by 3.1%, and American Indians by 5.0%, while non-Blacks appear to have been undercounted by 1.7%." *Id.* Defendant has provided to plaintiffs the computer tape containing the block level unadjusted census count pursuant to Public Law 94–171. *See* Supplemental Declaration of Mark W. Plant at ¶ 7; *see also* Declaration of William Lester Cavala in Support of Motion for Preliminary Injunction, at ¶ 7.

The second phase was the PES, which was a sample survey of approximately 170,000 housing units taken after the census and then compared to the census in an attempt to measure coverage error or net undercount or overcount. Plant Supp.Decl. at ¶ 7. Each person in the PES sample was assigned to one of 1392 statistical categories, known as post-strata. These post-strata categories attempt to group together persons of similar characteristics. *Id.* An undercount rate was estimated for each of the 1392 post-strata. *Id.*

The information gathered from the PES sample blocks was then compared with information for those same blocks that was obtained during the actual headcount. By comparing the number of representatives of each post-stratum found by the PES to the number of representatives of each post-stratum found by the headcount, the Bureau developed an adjustment factor which reflected the extent to which the PES suggested that a post-stratum was incorrectly counted in the official enumeration. The Bureau then attempted to calculate the effect of the postulated errors on the entire population by multiplying the number of people in each post-stratum found in a particular block by the appropriate adjustment factor for each post-strata represented in the block. This process was completed for each of the almost 5,000,000 inhabited blocks in the United States. Supp. Plant Decl. ¶ 7–9; Plant Decl. 6–8; Defendant's brief at 4–5.

The third phase of the adjustment decision process determined the adequacy of the PES as an evaluation and adjustment

tool. *See* Plant Decl. at ¶ 8. Department officials undertook a large-scale, intensive evaluation of the accuracy of the adjusted estimates involving dozens of statisticians, demographers and other experts both within and outside the Department of Commerce. Experts differed on whether adjusted census figures were more reliable than the actual census figures. *See* Exhibit C to Brenner Prelim. Inj. Decl. Evaluative studies indicate that one-third of the over five million persons who would be added to the count are a result of biases in the undercount measurement instrument, not a result of persons being missed in the census. *See* Plant Supp.Decl. at ¶ 15.

The final step in the process was a decision on the adjustment question by the Secretary based on published guidelines. *See Decision,* 56 Fed.Reg. at 33582. On July 15, 1991, he announced his decision that the census should not be changed by statistical adjustment. *Id.* In reaching his decision, the Secretary determined that the adjusted estimates did not accurately distribute the U.S. population across and within the states. *See* Plant Supp.Decl. at 13. He concluded that the adjusted figures were not usable for all purposes for which the census data are published, and that release of the adjusted counts would be confusing and disruptive to the orderly transfer of political representation in the United States. *Id.* Nevertheless, he indicated the Department would "provide the full record of the basis for our decision as soon as it is available." *See Decision,* 56 Fed.Reg. at 33583. Evidently, defendant has recently agreed to provide Congress with 50% of the adjusted census data of the states. *See* Plaintiffs' Request For Judicial Notice Exhibit B & C.

### B. *Block Level Adjusted Census Data*

The requested tapes containing the adjusted census data derived from this process exist on computer tapes physically located at the Bureau of Census and within the control of the defendant. Decl. of J. Patrick Heelen, Attachment B, ¶ 5. The defendant created the tapes anticipating that the Secretary may have elected to use the adjusted figures as the official census figures. *See* Plant Decl. at ¶ 11. As of the date of the Secretary's decision not to adjust the Census, the Bureau of Census had prepared for distribution computer tapes for all 50 states containing the adjusted census figures. *See* Exhibit A of Brenner Decl.. Based on an in camera inspection of a representative sample of the requested tapes, the court has determined that the tapes provide a list of numbers based on the adjusted census data, broken down by race, associated with census blocks identical in form and similar in content to the official census data previously released to California. *See also* 13 U.S.C. § 141(c); Decl. of Bailar at ¶ 7.

### C. *The FOIA Request*

Plaintiffs have made a FOIA request of defendant for the tapes, the agency denied the request invoking Exemption 5, and the administrative process is complete. *See* Joint Status Statement at 2.

### D. *Prior Proceedings in this Case*

Plaintiffs filed a complaint and application for preliminary injunction on July 25, 1991 seeking an order compelling the production of agency records consisting of the official census tabulation of the population of California as adjusted in accordance with the Post–Enumeration, and related records. Defendant opposed the application and moved to stay the proceedings on August 19, 1991.

The court heard argument on plaintiffs' motion for preliminary injunction and defendant's motion to stay on August 20, 1991. At the conclusion of argument the court denied defendant's motion to stay the proceedings and granted a preliminary injunction ordering disclosure of the requested tape by the close of business on August 21, 1991. At the same time the court denied defendant's motion for stay pending appeal. The defendant filed a notice of appeal from the court's order on August 21, 1991.

On August 21, 1991, the Ninth Circuit Court of Appeals issued a temporary stay of the court's order. Subsequently, on August 30, 1991, a two-judge majority of the court ruled the appellant had failed to show

the balance of hardships tipped in its favor; that respondent had made the opposite showing; and that appellant "has also failed to show a probability of success on the merits of the appeal." *See* Attachment E to Defendant's Motion for Summary Judgment. Circuit Judge T.G. Nelson dissented from the order based in part on a declaration submitted by defendant in the appellate court suggesting that "the deliberative process may have included adjusted block calculations ..." and based in part on the view that the requested tape "is the product of the deliberative process, which was rejected by the Secretary." *Id.* The order of that court left the temporary stay in place until September 3, 1991, at 2:00 p.m. PDST.

The parties represent that on August 31, 1991, the defendant filed an emergency application in the United States Supreme Court with Circuit Justice O'Connor for a stay of this court's order pending appeal. Subsequently, Justice O'Connor granted a temporary stay to permit the parties to file papers regarding the Department's application for a stay. On September 10, 1991, the Supreme Court entered an order staying this court's preliminary injunction order pending final disposition of the appeal of that order by the Ninth Circuit. *United States Department of Commerce v. Assembly of the State of California,* —— U.S. ——, 112 S.Ct. 19, 115 L.Ed.2d 1103 (1991). On November 19, 1991, the parties filed a Joint Status Conference Statement in district court, stipulating that they would seek a stay in the court of appeals, and would file cross-motions for summary judgment. The court of appeals granted the motion to stay pending disposition of the cross-motions on January 31, 1992.[1]

### E. *Plaintiffs' Request for Judicial Notice*

As a preliminary matter, the court considers plaintiffs' request for judicial notice pursuant to Federal Rule of Evidence 201(d). Plaintiffs seek to have judicially noticed the facts: (1) that defendant has agreed to provide to the House Subcommittee on Census and Population 50% of the adjusted census block data for the nation; (2) that the adjusted census block data submitted to the House Subcommittee on Census and Population will be made available by the subcommittee to the public on an "as requested" basis; (3) that an order has been entered in *Florida House of Representatives, et al. v. United States Department of Commerce,* No. TCA 91–40387–WS (N.D.Fla. January 9, 1992) granting summary judgment for plaintiffs and ordering defendant to disclose census figures under the FOIA for the State of Florida;[2] (4) that defendant has been ordered in *City of New York, et al. v. United States Department of Commerce, et al.,* No. CV 88–3474 (JMcL) to produce discovery to plaintiffs, including under protective order, the block level adjusted census data for all fifty states;[3] (5) that the official census population counts have been and continue to be revised by the Bureau of the Census.

■■■ Section 201 permits the court to take judicial notice of facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. The court has examined the various exhibits supporting the requests

---

**1.** Based on that order, the court is satisfied that it continues to exercise jurisdiction over this case, and may proceed to consider the merits. *See Plotkin v. Pacific Telephone and Telegraph Co.,* 688 F.2d 1291, 1293 (9th Cir.1982); *see also N.Y. State Nat. Organization for Wowen v. Terry,* 886 F.2d 1339, 1350 (2nd Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990).

**2.** On January 14, 1992, the United States Court of Appeals for the Eleventh Circuit granted the Department of Commerce's motion for stay pending appeal of the summary judgment order and ordered that the appeal be expedited. *See* Declaration of Barbara A. Brenner in Opposition to Defendant's Motion For Summary Judgment And In Support of Plaintiffs' Request For Judicial Notice at ¶ 5.

**3.** Evidently, the block level adjusted census estimates that plaintiffs requested in this action were released to the Attorney General of the State of California on October 10, 1991 under protective order in *City of New York, et al. v. United States Department of Commerce, et al.,* No. 88 Civ.–3474 (E.D.N.Y.). Stipulation and Order, *City of New York et al. v. United States Department of Commerce,* et al., 88–Civ. 3474 (E.D.N.Y.). *See* Defendant's Statement of Undisputed Facts at ¶ 5.

and concludes that requests (3) & (4) are the proper subject of judicial notice insofar as these documents are verifiable by resort to authoritative sources. *See MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986) (in action by insurer of bank against various defendants, including two attorneys, court of appeals took judicial notice of motion to dismiss and supporting memorandum which had been filed in earlier declaratory judgment action regarding bank's insurance coverage). Similarly, requests (1) and (5) appear to be the proper subject of judicial notice. *See Mack v. South Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir.1986) (court of appeals took judicial notice of records and reports of administrative bodies). However, with respect to request (4), the court is unable to take judicial notice of the fact defendant has produced the computer tape, although the court notes that defendant has stipulated to that fact.

■ Request (2) asks the court to judicially notice a fact arising from a volley of oral and written exchanges between Congressman Sawyer and a House staff member and one of the plaintiffs' attorneys in this case. These exchanges are neither generally known nor readily verifiable and thus not the proper subject of judicial notice.

## II. DISCUSSION

### A. *Summary Judgment Standards*

■ A motion for summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is a proper means of resolving an FOIA claim. *See National Wildlife Federation v. United States Forest Service*, 861 F.2d 1114 (9th Cir.1988). Thus, the court proceeds to consider whether as a matter of law the requested tapes are exempt from disclosure.

### B. *Exemption 5*

■ "The [FOIA] sets forth a policy of broad disclosure of Government documents in order to ensure an informed citizenry, vital to the function of a democratic society." *FBI v. Abramson*, 456 U.S. 615, 621, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982) (citations omitted). "Yet Congress realized that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused." *Id.* It is a fundamental principle of FOIA law that an individual's particular need or special interest in a particular document cannot affect the breadth of these exemptions, because "Congress clearly intended the FOIA to give any member of the public as much right to disclosure as one with a special interest [in a particular document]." *United States Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 771, 109 S.Ct. 1468, 1480–81, 103 L.Ed.2d 774 (1989) (internal quotation marks omitted; brackets in original). Relying upon 5 U.S.C. § 552(b)(5) (Exemption 5), defendant contends the requested tapes are exempt from disclosure.

Exemption 5 shield from public disclosure:

> inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency[.]

*Id.* The existence of the exemption depends on two inquiries: (1) whether the information sought is contained in inter- or intra-agency memoranda, and (2) whether the document in question consists of material that would not be available by law to a party in litigation with the agency. The agency bears the burden of proof to show that documents are exempt. *National Wildlife Federation v. United States Forest Service*, 861 F.2d 1114, 1116. The court reviews the agency determination in this case de novo. 5 U.S.C. § 552(a)(4)(B).

#### 1. Memorandum or Letter

■ Defendant contends, and plaintiffs do not dispute, that the requested computer tapes constitute memoranda or letters and thus satisfy the first prong of Exemption 5. *See Florida House of Representatives, et al.*, TCA 91–40387–WS, at 7 (Order N.D.Fl. January 9, 1992); *see also Chilivis*

*v. SEC*, 673 F.2d 1205, 1212 n. 15 (11th Cir.1982). Nor can there be serious dispute that the requested tapes were prepared by an agency. Based on this showing, the court is satisfied that the requested tapes constitute "agency memoranda" within the meaning of Exemption 5.

However, the court cannot join in defendant's apparent assumption that if the tapes are to be included within a definition of agency memoranda, defendant has discharged its burden of proving that they therefore constitute either "inter" or "intra" agency memoranda as Exemption 5 explicitly requires. At least one court has held that "[b]oth the prefixes 'inter' and 'intra' imply that the communication involved was transmitted from one government employee to another." *Temple–Eastex, Inc. v. N.L.R.B.*, 410 F.Supp. 183, 185 (E.D.Tex.1976). Indeed, in discussing the terms, the Supreme Court has indicated that: "By including inter-agency memoranda in Exemption 5, Congress plainly intended to permit one agency possessing decisional authority *to obtain* written recommendations and advice from a separate agency not possessing such decisional authority without requiring that the advice be any more disclosable than similar advice *received* from within the agency." *Renegotiation Board v. Grumman Aircraft Eng. Corp.*, 421 U.S. 168, 188, 95 S.Ct. 1491, 1502, 44 L.Ed.2d 57 (1975) (emphasis added). However, in some cases an inter-agency memorandum is not itself circulated. Consequently, the Third Circuit has held that handwritten notes prepared for a file, but not circulated within an agency, are nevertheless intra-agency memoranda. *Conoco Inc. v. United States Dept. of Justice*, 687 F.2d 724 (3rd Cir.1982). Quite apart from the inquiry into the role the requested tapes played in the decision-making process (discussed below), it appears that to be intra- or inter-agency documents the tapes must have been "created for the purpose of aiding the agency's deliberative process." *Dow Jones & Co. v. Department of Justice*, 917 F.2d 571, 575 (D.C.Cir. 1990) ("Therefore, as long as the documents are created for the purpose of aiding the agency's deliberative process, as were the questionnaires in *Ryan*, they will be deemed intra-agency documents even when created by non-agency personnel."); *see also Ryan v. Department of Justice*, 617 F.2d 781, 790 (D.C.Cir.1980).[4] Documents exchanged between a government agency and an outside adverse party are not an inter- or intra documents exempt from disclosure. *M/A–Com Information Systems, Inc. v. United States Department of Health and Human Services*, 656 F.Supp. 691, 692 (D.D.C.1986).

The court is unable to conclude the intra- or inter-agency requirement has been satisfied in this case. In fact, defendant seems to argue against it: "Plaintiffs maintain, correctly, that 'the adjusted tapes *were not prepared for internal consideration* but were prepared instead for public distribution if the Secretary decided to adjust the census.'" (emphasis added). Reply Brief at 3. The record supports defendant's concession. The computer tapes were prepared for distribution to the 50 states by the Bureau of Census in the event the Secretary decided to adjust the census. *See* Exhibit A attached to Brenner Decl., Interview with Peter Bounpane. They were required to be prepared under a court stipulation that said the Bureau of Census had to be in a position to rerelease those tapes with adjusted counts should the Secretary decide to adjust the census. *See Id.* Arguably, the computer tapes more closely resemble an extra-agency memoranda than they do an internal agency communication or a communication from one agency to

---

**4.** The intra- inter-agency component overlaps with the predecisional and deliberative components discussed below. Nevertheless, a document can be an intra- or inter-agency memorandum without necessarily being predecisional or deliberative. To illustrate, consider this passage from *Access Reports:* "A key feature under both the predecisional deliberative criteria is the relation between the author and recipient of the document. A document *from* a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient. By contrast, one *moving* from senior to junior is far more likely to manifest decision making authority and to be the denouement of the decisionmaker rather than part of its give-and-take." *Access Reports*, 926 F.2d at 1195 (emphasis added).

another. *Cf. M/A–Com Information Systems, Inc. v. United States Department of Health and Human Services,* 656 F.Supp. 691 (D.D.C.1986). Although the record suggests agency personnel may have briefly examined samples of adjusted data from which the tapes were in part derived, the requested tapes themselves were not created to aid the deliberative process. *Dow Jones & Co. v. Department of Justice,* 917 F.2d at 575. While argument on this issue has not been developed, and admittedly the analogy to an extra-agency document is less than precise, the court is nonetheless troubled by the defendant's lack of showing that the intra/inter component of Exemption 5 exists on these facts.[5]

### 2. Deliberative Process Privilege

The second prong of the analysis of Exemption 5 has been interpreted to incorporate several discovery privileges enjoyed by government in litigation with private parties. *United States Department of Justice v. Julian,* 486 U.S. 1, 11–12, 108 S.Ct. 1606, 1613, 100 L.Ed.2d 1 (1988). Here, the only Exemption 5 privilege asserted by the defendant is the deliberative process or executive privilege designed to protect the decision-making processes of government agencies. *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975). Under the deliberative process privilege, an agency may withhold documents "reflecting the advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id.* It is generally understood that to qualify for exemption under the "deliberative process" privilege, a document must be *both* (1) "predecisional" or "antecedent to the adoption of agency policy" and (2) "deliberative," meaning "it must actually be related to the process by which policies are formulated." *National Wildlife Federation v. United States Forest Service,* 861 F.2d at 1117 (emphasis in the original). "These twin requirements recognize that the underlying purpose of this privilege is to 'protect[ ] the consultative functions of the government by maintaining the confidentiality of advisory opinions, recommendations, and deliberations, comprising part of a process by which governmental decisions and policies are formulated.' " *Id.* (quoting *Jordan v. United States Department of Justice,* 591 F.2d 753, 774 (D.C.Cir.1978).

### (a). *Predecisional*

■ In determining whether a document is "predecisional" the court focuses its "attention on the role of the entire document in the decisionmaking process." *Access Reports v. Department of Justice,* 926 F.2d 1192, 1195 (D.C.Cir.1991). "Predecisional documents are thought generally to reflect the agency 'give and take' leading up to a decision that is characteristic of the deliberative process[.]" *Access Reports v. Department of Justice,* 926 F.2d 1192 (D.C.1991) (citing *Sears,* 421 U.S. at 152 n. 19, 95 S.Ct. 1504; *Formaldehyde Institute v. Dept. of Health and Human Services,* 889 F.2d 1118 at 1122, 1123 (D.C.Cir.1989). Some courts define a "predecisional document" as one "prepared in order to assist an agency decision-maker in arriving at his decision, *Grumman Aircraft,* 421 U.S. at 184, 95 S.Ct. at 1500, and may include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency, *Coastal States [Gas Corp. v. Dept. of Energy* ], 617 F.2d [854] at 866 [(C.A.D.C.1980) ]." *Formaldehyde Institute,* 889 F.2d at 1122; *see also Hopkins v. U.S. Dept. of Housing & Urban Dev.,* 929 F.2d 81, 84 (2nd Cir.1991).

The computer tapes were created in order to be prepared for a decision by the Secretary of Commerce to adjust the census. *See* First Plant Decl. at ¶ 11. As Ms. Bailar stated in her declaration, "[n]othing in the Secretary's decision or the materials related to it indicates the adjusted PL 94–

---

5. Defendant argued at oral argument that while the tapes might not have been an intra- or inter-agency memoranda, the data contained on the tapes constitute intra- or inter-agency memoranda. The argument seems at odds with case law.

Court's consistently focus on the document itself, consistent with language of the statute, in determining whether it is intra-or inter-agency memoranda. *See, e.g., Dow Jones & Co. v. Department of Justice,* 917 F.2d at 575.

171 data were reviewed by the Secretary in connection with his decision." Declaration of Barbara A. Bailar In Support of Motion For Preliminary Injunction at ¶ 8. Furthermore, "[i]t would not have been necessary for the Secretary to review the adjusted PL 94–171 data in order to reach his decision." *Id.* at ¶ 9. Indeed, counsel for the defendant concedes the requested tapes were not evaluated as part of the deliberative process. Reply at 3; *see also* Transcript from Hearing on Preliminary Injunction. Accordingly, the court finds the requested tapes were not prepared in order to assist the Secretary in arriving at his decision and had no role in his decision not to adjust the census.

Defendant proposes the court should focus on whether the data contained on the "documents [ ] contributed to a deliberative process within the agency." *Access Reports,* 926 F.2d at 1196 (emphasizing that assertion of exemption does not turn on the ability of the agency to identify a specific decision to which the document contributed).[6] In this larger sense, the defendant argues it is not necessary for the decision-maker to have considered the actual document sought to be disclosed so long as an evaluation of the information on the tapes, contributed to defendant's deliberative process. This inquiry bears some relation to Circuit Judge T.G. Nelson's expression that the "declaration of Mr. Plant filed in this court demonstrates to me that the deliberative process may have included adjusted block calculations ..."[7] *See* Defendant's Attachment E to Motion for Summary Judgment.

The decision-making process here can only be the process of deciding whether to adjust the 1990 census. *See Access Reports,* 926 F.2d at 1196. Not only did the tapes have no role in that process, the record does not support the inference that the adjusted block counts played a meaningful role in that process. Mr. Plant indicated in his declaration filed in the Ninth Circuit and reiterates here that "[p]rior to the July 15, 1991 adjustment decision, [he] examined a random sample of 500 adjusted block population counts to assist the Under Secretary in coming to his recommendation to the Secretary. The random sample was selected from a set of block-level redistricting counts which included blocks from California." Attachment D to Defendant's Motion for Summary Judgment at ¶ 5; *see also* Exhibit A at ¶ 10 (substantially the same but omitting the reference to California in particular). However, Mr. Plant has also indicated in deposition testimony that the examined samples were not from the requested tapes, were from some unidentified blocks chosen from the PES, the examination consisted of roughly one day's work, was never memorialized, and "in some sense" was never completed. He also has stated that the sample he analyzed is not part of the administrative record "because it did not enter in any way direct or indirect into the Secretary's decision." Declaration of Barbara A. Brenner in Opposition to Defendant's Motion For Summary Judgment And In Support of Plaintiff's Request For Judicial Notice, Exhibit A at 55–62. Finally, although Mr. Plant indicates that he examined adjusted block level block population counts to assist the

---

**6.** Defendant's misphrases the test when it states, "[a] document is predecisional if it was created as part of the process leading up to an agency decision, ..." Opening Brief at 13. First that phrasing is no where to be found in any of the cases discussing the predecisional requirement. Second, it misses the focus of the inquiry. The question is did the document *contribute* to the deliberative process of an agency. *See Access Reports,* 926 F.2d at 1195–97.

**7.** Circuit Judge T.G. Nelson also indicated he would remand for further consideration of the "precise relationship between the tape and the adjusted block calculations specifically considered by Mr. Plant." *Id.* The relationship re-

mains somewhat clouded. It appears that the presentation of the information on the tape is unique in part to meet the particularized needs of the state redistricting process. *See* 13 U.S.C. § 141(c). Nevertheless, it does appear that the requested tapes reproduce the information conveyed by the adjusted block counts, a sample of which were examined by Mr. Plant prior to the Secretary's decision. *See* Decl. of Brenner in opp. to defendant's motion, exhibit A. at 60 (Q. "So the actual comparison that you set out to do is not reproducible by any means other than with the PL 171 numbers; is it?" A. "That's correct.").

Under Secretary in coming to his recommendation to the Secretary, he ultimately reported to the Under Secretary that his examination was inconclusive. *See* Brenner Decl. at 67.[8]

That Mr. Plant's examination of adjusted block counts was so detached is not surprising. The adjusted PL–171 data or tape "contains nothing that is necessary or useful to deciding whether the census should be adjusted." Decl. of Bailar at 7. According to Ms. Bailar, the decision whether to adjust turns on the reliability of the adjustment formulae to be applied to the original count not the adjusted numbers." *Id.* Those formulae have already been disclosed as part of the administrative record. *See* Decl. of Brenner in Opp. to Defendant's Motion, Exhibit A at 54–55.[9]

 Defendant also offers the declaration of Deputy Chief Counsel Heelen indicating that the agency determined that the adjusted tapes formed the basis of an interdepartmental recommendation later rejected by the Secretary. Attachment B to Defendant Motion for Summary Judgment, Declaration of J. Patrick Heelen at ¶ 6. The defendant agency's determination is not entitled to deference. At best, Mr. Heelen's declaration sets forth the legal conclusion upon which the agency based its denial of plaintiffs' FOIA request. Affidavits in support of exemptions will not discharge defendant's burden of proving an exemption if they are conclusory, mere repetitions of the statutory language, or if they include sweeping, vague claims. *See Hayden v. National Security Agency*, 608 F.2d 1381, 1387 (D.C.Cir.1979), *cert denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

Based on the court's review of the record and its in camera inspection of a representative sample of the requested tapes, it finds that the tapes and the information conveyed by them played, at best, a trivial and inconsequential role in the deliberative process leading to the Secretary's decision. Had the block level adjusted data played a measurable role in the deliberative process, the court does not doubt that the Secretary would have fulfilled his promise to disclose the data with the rest of the record upon which the defendant based its decision. *See* Vol. 56, No. 140 Fed.Reg. at 33583. ("The Department has tried to make the process leading to this decision as open as possible. In that spirit we will provide the full record of the *basis for our* decision as soon as it is available.") (emphasis added). Undoubtedly, the assumptions, and hypotheses identified in the administrative record contributed to the deliberative process over the adjustment decision. *See* Plant Supp. Decl. at ¶ 3. However, plaintiffs, in seeking disclosure of the requested tapes, do not seek disclosure of assumptions and hypotheses for the obvious reason that they have already been disclosed. Rather, plaintiffs seek the requested tapes. Defendant has not met its burden of demonstrating that the requested tapes constitute predecisional intra-agency memoranda.

Nor is the court persuaded by defendant's attempt to meet its burden of proof on the predecisional issue by effectively shifting the burden of proof and arguing the documents are not post-decisional. Certainly "the line between predecisional documents and postdecisional documents may not always be a bright one." *Sears*, 421 U.S. at 152 n. 19, 95 S.Ct. at 1518 n. 19. The computer tapes were prepared for postdecisional disclosure if the Secretary decided to adjust the census. In this important sense, they were postdecisional. Yet, in another sense, the requested tapes are not classically "postdecisional" because they did not supply the basis for a policy

---

**8.** Defendant also indicated for the first time at oral argument that the Special Advisory Panel evaluated the adjusted numbers as part of its recommendation to the Secretary. The record does not support that assertion.

**9.** Defendant's analogy to *Bureau of Nat. Affairs v. United States Department of Justice*, 742 F.2d 1484 (D.C.Cir.1984) is unpersuasive. That court held that budgetary estimates "submitted by one agency to a second agency that has final decisional authority are predecisional materials exempt from disclosure under FOIA." *Id.* at 1497. In contrast here the requested census figures were neither submitted to the final decisionmaker nor do they play a role in the decisionmaking process.

option that was actually adopted. *Quarles v. Department of Navy*, 893 F.2d 390, 392 (D.C.Cir.1990).[10] Nevertheless, when a document straddles the "postdecisional" classification, the defendant does not satisfy its burden of proof by demonstrating what result might obtain if plaintiffs had the burden of proving the documents were postdecisional. Consistent with the allocation of the burden set forth in the FOIA, the existence of exemption depends on whether defendant has sustained its burden of proving the documents are predecisional. *See* 5 U.S.C. § 552(a)(4)(B).

 Defendant also asserts the tapes at issue are analogous to a draft of a policy option which was ultimately rejected, and thus remain predecisional.[11] *Pies*, 668 F.2d at 1353. In this vain, defendant argues the computer tapes do not reflect agency policy, *Pies v. United States IRS*, 668 F.2d 1350, 1353 (D.C.Cir.1981) or reasons supporting a policy, *Sears*, 421 U.S. at 152, 95 S.Ct. at 1517, and consequently would be of only marginal interest to the public, and therefore remain protected by Exemption 5. *Id.*

However, the analogy which defendant seeks to draw is flawed. First, the requested tape was created to be disclosed in the event the Secretary decided to adjust the census, not to be a rough draft of something else. Unlike a typical draft document, the requested tapes never went to the decision-maker for review, comment, or criticism, and never returned to the originator for revision. *See Pies*, 668 F.2d at 1353 ("After their initial review [the documents] were returned for revision but were never revised and Section 48(h) was subsequently repealed."); *see also National Wildlife Federation*, 861 F.2d at 1120 ("These documents are merely working drafts subject to revision."). In contrast to the situation here, where according to Mr. Bounpane, the Bureau of Census had prepared computer tapes for all 50 states "ready to go" had the Secretary decided to adjust the census. *See* First Brenner Decl., Exhibit A.

Second, plaintiffs are not seeking disclosure of the reasoning behind a rejected policy option or even the rejected policy option itself, both have already been disclosed. Rather, plaintiffs seek the adjusted census data, portions of which have already been disclosed and evidently continue to be disclosed with increasing specificity. *See* Plaintiffs' Request for Judicial Notice Exhibit B.[12] Distinct from the public's interest in proposed tax regulations, *Pies*, or an advice and appeals memorandum, *Sears*, the public's interest in the adjusted census data contained on the tapes goes beyond "satisfying public curiosity." *Pies*, 668 F.2d at 1353. The public's interest is broad and deep. The requested documents are some of the few generated by the Government in attempt to represent every person in the country and hopefully every person directly or indirectly played a part in creating. The Bureau of Census undertakes the impossible task of counting every person in the country on a decennial basis because the constitution requires it and

---

**10.** To this end, defendant argues that unless the documents are postdecisional the rationale for disclosure does not apply since the only statutory purpose of disclosure is to prevent an agency from developing a secret body of law. This is a primary purpose of the FOIA but not the only one. *See, e.g., Department of Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (purpose is to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."); *Mobil Oil Company*, 879 F.2d at 701 (underlying statutory purpose is to implement a policy of broad disclosure of public records).

**11.** This argument also reflects a concern of Circuit Judge T.G. Nelson.

**12.** Defendant also argues the documents at issue were created "pursuant to an established self-evaluation and improvement plan." *Ashley v. United States Department of Labor*, 589 F.Supp. 901 (D.D.C.1983). Defendant's adjustment methodology may have been prepared as part of a continuing self-evaluation plan, but the tapes were prepared pursuant to court stipulation. Further, if the court were to apply the continuing self evaluation theory to this case, it is doubtful if anything defendant creates with respect to the census will ever be subject to disclosure because any document can always be asserted to be part of an ongoing self-evaluation campaign. Finally, unlike the documents in *Ashley*, the tapes were not addressed to agency superiors to help them formulate general or specific policies. *Id.* at 908.

undertakes the unenviable task of attempting to measuring the failures of the enumeration because accuracy is important to the public interest. *See* U.S. Const. Art. I § 2. It is presumably in recognition of the vital public interest at stake that we even have an adjustment decision. The court shares with Mr. Bounpane the hope that "one positive thing that can come out of a controversy like the adjustment issue is for people to understand the importance of the census...." Brenner Decl. Exhibit A, Interview. The requested tapes contain the fruits of an important government endeavor in which the public has more than a marginal interest.

### (b). *Deliberative Process*

█ "While the 'predecisional' label clearly focuses attention on the role of the entire document in the decisionmaking process, (citations omitted), the deliberative process criterion may be useful in distinguishing between privileged and nonprivileged material within a single "predecisional" document." *Access Reports*, 926 F.2d at 1195; *see EPA v. Mink*, 410 U.S. 73 at 88, 93 S.Ct. 827 at 836, 35 L.Ed.2d 119 (1973) (requiring disclosure of "purely factual material contained in deliberative memoranda" which was "severable from its context"). As a rough guideline, courts have distinguished between facts and opinions with the later presumably reflecting the deliberative processes while the former do not. *See Access Reports*, 926 F.2d at 1195. However, many factual documents "expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Quarles v. Department of Navy*, 893 F.2d 390, 392 (D.C.Cir.1990). "Hence, even if the content of a document is factual, if disclosure of the document would expose 'the decision-making process itself' to public scrutiny by revealing the agency's 'evaluation and analysis of the multitudinous facts,' the document would none the less be exempt from disclosure." *National Wildlife Federation*, 861 F.2d at 1118. "The 'key question' in identifying 'deliberative' material is whether disclosure of the information would 'discourage candid discussion within the agency.'" *Access Reports*, 926 F.2d at 1195 (citations omitted).[13]

**13.** Defendant argues Exemption 5 should be interpreted to protect not only the deliberative process but also *products* of the deliberative process like the adjusted census figures (emphasis added). However, the case from which defendant draws the products rule is factually inapposite. *See Montrose Chemical Corporation of California v. Train*, 491 F.2d 63, 68 (D.C.Cir. 1974). In *Montrose,* plaintiff sought disclosure under the FOIA of two staff-prepared summaries of factual evidence developed at a hearing. The district court ordered disclosure and the court of appeals reversed. "The EPA assistants here were exercising their judgment as to what record evidence would be important to the Administrator in making his decision ... [His] use of his assistants was similar in many ways to a judge's use of his law clerk to sift throughout the report of the special master or other lengthy materials in the record ... To probe the summaries of record would be the same as probing the decision-making process itself." *Id.* at 68.

Restored to its context, *Montrose* demonstrates no significant expansion of the deliberative process privilege. The *Montrose* court's reference to product refers to the final opinion released by the Agency, not to the matter withheld. That decision did not involve the policy of encouraging "frank intra-agency discussion of policy" at issue here, but rather the policy need "to ensure that the mental processes of decisionmakers are not subject to public scrutiny." *Id.* at 70. In contrast, here the document in issue was neither examined by a decisionmaker, nor created for that purpose. Thus, disclosure would not result in "probing the mental processes of an executive branch decision-maker." *Id.* at 69.

The expansive reach of defendant's various tests can best be illustrated by applying them together. Defendant has proposed that for a document to be predecisional "it is enough for the document to be prepared in connection with some deliberative process." Defendant's brief at 14. Further the deliberative process includes the "products" of that process. Applied literally, the court would virtually be compelled to conclude that a final agency opinion falls squarely within Exemption 5 because it is the "product" of a deliberative process and "was prepared in connection with some deliberative process." Of course, the statute specifically requires disclosure of final agency opinions. *See* 5 U.S.C. § 552(a)(2)(A). The court is wary "of 'the inevitable temptation of a governmental litigant to give [this exemption] an expansive interpretation in relation to the particular records in issue.'" *Montrose Chemical Corp.*, 491 F.2d at 67 (quoting *Soucie v. David,* 448 F.2d 1067 (D.C.Cir.1971).

The court has previously conducted an in camera inspection of a representative sample of the requested tapes. The numerical data contained on these tapes, like the official census data, provides a list of numbers of people, broken down by race, associated with census tracts. The court finds the material is purely factual and in no way divulges the reasoning process through which the data was derived or in any way explains any recommendation or decision not to adjust the census. *See General Services Administration v. Benson*, 415 F.2d 878 (9th Cir.1969) (property appraisal data ordered disclosed); *see also Pacific Molasses Co. v. NLRB*, 577 F.2d 1172 (5th Cir.1978) (requiring disclosure of report that was "little more than a mechanistically compiled statistical report which contains no subjective conclusions ...").[14] Semantics aside, this is not a case where a document "characterized as factual would so expose the deliberative process that it must be covered by the privilege." *Wolfe v. Department of Health and Human Services*, 839 F.2d 768, 774 (D.C.Cir.1988) (en banc).

Defendant argues the requested tapes are deliberative rather than factual because they constitute numerical recommendations, flexible, elastic and subject to change. *See e.g., Quarles*, 893 F.2d at 392–93. It compares the numerical data contained on the tapes to, among other things, cost estimates, *Quarles*, an appraiser's report that contained estimates used in contract negotiations, *Martin Marietta Aluminum v. Administrator, General Ser-*

*vices Admin.*, 444 F.Supp. 945, 949–50 (C.D.Cal.1977), and telephone survey results. *See Times Journal Company v. Department of Air Force*, 793 F.Supp. 1 (D.D.C.1991). Defendant warns that the adjusted numbers:

> ... are not raw data but a statistical construct that embodies a host of calculations, assumptions and hypotheses analyzed by the Department in determining whether adjustment was appropriate.

Supp.Decl. of Plant at 3. Viewed in this light defendant contends the adjusted figures are completely different from the unadjusted figures because they are created rather than discovered.

These arguments give the court pause, but ultimately the court remains unpersuaded. First, the adjusted census data are no more numerical recommendations than the official census data which defendant contrasts as an example of a purely factual and disclosable data. Those numbers too are elastic and far from fixed. At the most general level every redistricting tape released to the states for intrastate redistricting arguably is nothing more than a numerical recommendation. *See Young v. Klutznick*, 652 F.2d 617, 624–25 (6th Cir.1981) (states not constitutionally required to use official census figures in redistricting). At a more specific level, the unadjusted figures are an approximation, as are the adjusted census figures. Supp. Declaration of Barbara A. Bailar In Support of Plaintiffs' Motion For Summary Judgment at ¶¶ 5, 6. The adjusted figures are subject to refinement as are the official census figures. *See* Plaintiffs' Request for

---

**14.** Defendant argues *Benson* is not helpful because (1) that case "relied heavily" on an internal regulation which required disclosure; and (2) *Benson* is based on an outdated facts/opinion analysis. First, the court acknowledges that some courts have read *Benson* as resting heavily on the fact that an agency regulation required disclosure in that case. However, the court cannot agree with such a reading. After tersely concluding the regulation compelled disclosure, the court in *Benson* stated, *[a]side* from the regulation there is further reason to grant appellee the access to the records that he seeks." *Id.* at 880 (emphasis added). The court then went on to consider Exemption 5 *without reliance on* the regulation. This is not the language a court uses when it means to suggest that the FOIA did not independently require disclosure.

Second, the court disagrees with defendant's assertion that the fact/opinion distinction is for all purposes outmoded. *See Access Reports* ("thus the opinion-fact line that we have often used as a rough guide to separate exempt from non-exempt material grows out of the "deliberative" requirement. The message emerging from recent cases is that the fact/opinion distinction offers a rough guide for separately exempt material from nonexempt material but that courts should be mindful that numbers like opinions can also reveal the mental processes of decision makers. *See National Wildlife*, 861 F.2d at 1118–19. "[T]he ultimate objective of exemption 5 is to safeguard the deliberative *process,* not the paperwork generated in the course of that process." *Id.* at 1119.

Judicial Notice, Exhibit F. Some of the deficiencies with the enumeration process itself are passed along and in some cases repeated during the PES. *See* Brenner Decl. Exhibit A, Interview with Bounpane (suggesting problem of census takers not going into certain buildings also arise during course of PES.). Like the adjusted census figures, in many instances, the census enumeration does not entail the discovery of a fixed number of inhabitants. *See* Supp.Decl. of Bailar at ¶ 6. Rather many people in the enumeration are not directly counted, but rather counted based on information supplied by third parties, e.g., relatives, neighbors, building managers, or other means. *See* Brenner Decl. Exhibit A, Interview with Bounpane; *see also* Supp.Decl. of Bailar at ¶ 6. In the court's view, the two processes are not so fundamentally different as to render the product of one "classic, objective, non-deliberative material that must be disclosed under FOIA" and the product of the other deliberative material that must not be disclosed. *See* defendant's opening brief at 19. Both methods share common shortcomings, inadequacies and traits, and yield similar numerical data prepared for distribution to the states in precisely the same format.

Second, even assuming the requested tapes contained numerical estimates fundamentally different from the enumeration, release of the data would not "reveal the issues the [defendant] considers important or provide telling clues as to the [agency's] proposed course of action." *National Wildlife Federation*, 861 F.2d at 1121. Defendant has already disclosed all the calculations, assumptions and hypotheses underlying the data in the administrative record. *See* Plaintiffs' Request for Judicial Notice, *Florida House*, at 23–24 (citing *Tennessean Newspapers, Inc. v. Federal Housing Administration*, 464 F.2d 657 (6th Cir.1972); *see also* Third Brenner Decl., Exh. A., Plant Depo. at 53–55. "Both the specific guidelines and the recommendations of the members of the Special Advisory Panel used in the determination as to whether to adjust the census were already made public by virtue of their publication in the Federal Register. Furthermore, the methodology employed in arriving at the PES figures was also made public as were census figures for the national, state, and specified city levels. Therefore, the court finds that disclosing the adjusted census figures would not reveal anything more about the deliberative process than has already been disclosed by the agency.

An argument stressed by defendant is that release of the adjusted census figures would chill the on-going deliberative processes and "inaccurately reflect or prematurely disclose the views of the agency." *National Wildlife Federation*, 861 F.2d at 1119. In fact, defendant submits the declaration of Peter Bounpane asserting that the mere threat of disclosure has caused the Bureau of Census not to produce revised adjusted census figures at the block level. *See* Decl. of Peter Bounpane at ¶ 16–17, attachment A to Defendant's Response to Plaintiff's Motion for Summary Judgment. The court is not persuaded that release of the adjusted census tape for California will deter creative debate and candid discussion among defendant's employees. First, because the Secretary has already announced his decision not to adjust, there is no concern about premature disclosure of proposed policies regarding the 1990 census. *See, e.g., Quarles*, 893 F.2d at 393 ("Disclosure of the estimates *before* decision would pose addition risks.") (emphasis in original). Second, although Mr. Plant anticipates that disclosure will chill the deliberative process, *see* Supp.Dec. of Plant, it is not clear what he bases this opinion on since he has also indicated that no one at the Bureau of Census has indicated by document or otherwise their willingness to do future census research or experiment with statistical formulas would be inhibited by release of the block level data. Decl. of Brenner In Support of Summary Judgment, Exhibit A, at 120–21; *see also* Florida House of Representatives (rejecting same claim). Finally, in light of the defendant's prior disclosures, the incremental harm to the deliberative process accruing from disclosure here should be negligi-

ble. *Cf. City of New York*, Plaintiffs' Request for Judicial Notice, Exh. E, at 3. If there was a disincentive to produce information based on the harm caused by disclosure of inaccurate methodologies, assumptions or hypotheses, that has already occurred.[15]

The added risk of reputational injury to the Bureau of Census resulting from disclosure is not significant. The Census Bureau's reputation is for providing the most accurate information available at the time, acknowledging that no figures are either final or perfect. Bailar Supp.Decl. at ¶ 9. Bureau of Census Officials have indicated that reasonable minds can and have differed on question of whether to adjust the census. *See* Bounpane; Second Decl. of Brenner in Support of P.I. Exhibit E at 2; *see also* Decl. of Plant ¶ 26. As Chief Judge Stafford of the Northern District of Florida observed:

> The Department of Commerce has publicly stated that the adjusted census figures already published for the national, state and local levels are incorrect, and further, that the counts are most inaccurate the (unreleased) block levels.... Any harm to the Department's reputations has already occurred; because of the Department's candor, the public already knows that the block level data are inaccurate, and has a good idea of the extent of any inaccuracies.... This court fails to see how the release of the adjusted block level data could cause the Department to be any more "discredited" than it already might perceive itself to be.

*Florida House of Representatives*, Plaintiffs' Request for Judicial Notice, Exh. D, at 18–19.

Neither is the risk of public confusion compounded by disclosure. Although the court does not wish to determine the validity or reliability of the information contained in the requested documents, it does observe that the Undercount Steering Committee of the Bureau of Census, not an isolated official, recommended adjustment to the Secretary. *But cf. Russell v. Department of the Air Force*, 682 F.2d 1045, 1049 (D.C.Cir.1982) ("Therefore, exemption (b)(5) acts in this case to prevent the public from misconstruing the views of an individual Air Force Officer to be the views of the Air Force."). Those recommendations were not "low level evaluations and recommendations." *Ashley*, 589 F.Supp. at 909. In this case, "public confusion is more likely to result if important data underlying the decision is not disclosed." *City of New York*, Plaintiffs' Request for Judicial Notice, Exhibit E at 3. n. 1.

The court is also unpersuaded that disclosure of the adjusted tapes will disrupt the intercensal estimate process or result in "fuzzy [estimates] expressed as wide ranges." *See Quarles*, 893 F.2d at 393; *see also* Supp.Decl. of Plant at 20–25. To the extent such a disruption is based on defendant's fear that such a process will be subject to FOIA disclosure that fear is unsubstantiated and does not define the scope of the privilege. Each time an agency resists disclosing a document under the FOIA, it no doubt fears the effects of disclosure. However, those fears have to be better founded than they are in this case. Each FOIA case is considered on the merits. This situation is unique and the disclosure issues it raises for the agency need not be recurring.

---

**15.** Defendant argues that the court imports a defective waiver analysis when it evaluates the harm caused by disclosure against the backdrop of defendant's prior disclosures of the decision-making process. *See Mobil Oil Company v. Environmental Protection Agency*, 879 F.2d 698 (9th Cir.1989) ("[A]gency release of certain documents in a litigation environment does not necessarily waive any applicable exemption as to other documents."). The court disagrees. The court must survey what harm to the deliberative process, if any, might ensue from further disclosure and what of the deliberative process could possibly be disclosed that has not already been disclosed. The analysis must have a starting place consistent with the record. The record reveals that virtually the entire deliberative process has been disclosed. A difference between the court's measure of defendant's prior disclosure in this case, and a waiver analysis, is that here the extent of prior disclosure does not waive the privilege but merely is a factor that the court considers in determining the "incremental harm" at risk with disclosure.

## III. CONCLUSION

Defendant has not sustained its burden of demonstrating that the requested tapes are intra- or inter-agency memoranda protected from disclosure under the FOIA. Defendant has not sustain its burden of showing that the requested tapes are intra-agency or inter-agency memoranda. The requested documents were not prepared for internal consideration. Moreover, they played no role in the decision of the Secretary to adjust the census nor a meaningful role in the larger decision-making process on the adjustment issue. Finally, the requested tapes contain purely factual numerical data which do not disclose the deliberative process.

IT IS THEREFORE ORDERED that plaintiffs' motion for summary judgment be, and the same is, hereby GRANTED; and that defendant's motion for summary judgment be, and the same is, hereby DENIED. Defendant is ordered to disclose the requested tapes as they existed on July 15, 1991, when the Secretary announced his decision not to adjust the census.