704 So.2d 1083 (1997)
Rayna MYRON, a minor, By and Through her parents and natural guardians, Sharon BROCK and Herbert B. Myron and Sharon Brock and Herbert B. Myron, individually, Appellants/Cross-Appellees,
v.
DOCTORS GENERAL HOSPITAL, LTD.; Doctors Hospital, Inc. of Plantation; Universal Health Services, Inc., D/B/A Doctors General Hospital, N/K/A Universal Medical Center; Michael Gervasi, D.O.; Michael Stary, D.O.; Professional Emergency Services, Inc.; Peter J. Shulman, M.D.; Peter J. Shulman, M.D., P.A.; Marshall D. Ohring, M.D.; Marshall D. Ohring, M.D., P.A.; Saltzman, Tanis, Pittell, Levin and Jacobson, P.A., D/B/A Pediatric Associates; Humana, Inc., D/B/A Humana Hospital Bennett; Jack F. Kareff, M.D.; Wayne Lee, M.D., P.A., D/B/A Physicians Associates, Miguel Calzadilla, M.D.; Miguel Calzadilla, M.D., P.A.; Healthtrust, Inc.The Hospital Company, D/B/A Plantation General Hospital; Hospital Corporation of America, D/B/A Plantation General Hospital; Hospital Development & Service Corp., D/B/A Plantation General Hospital; Yvonne Rutherford, M.D.; Yvonne Rutherford, P.A., et al., Appellees/Cross-Appellants.
No. 95-0212.
District Court of Appeal of Florida, Fourth District.
December 31, 1997.
Rehearing, Rehearing and Certification Denied February 18, 1998.
*1085 Sheldon J. Schlesinger, P.A., Fort Lauderdale, and Joel S. Perwin of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, for appellants/cross-appellees.
Kevin P. O'Connor of O'Connor & Meyers, P.A., Coral Gables, for appellees/cross-appellants Peter J. Shulman, M.D., Peter J. Shulman, M.D., P.A., Marshall D. Ohring, M.D., Marshall D. Ohring, M.D., P.A., and Saltzman, Tanis, Pittel, Levin & Jacobson, P.A., d/b/a Pediatric Associates.
Ricki Lewis Tannen of Klein, Tannen & Cohen, P.A., Hollywood, for appellees/cross appellants Doctors' General Hospital, Dr. Gervasi and Dr. Brown.
Miles A. McGrane, III of McGrane & Nosich, P.A., Coral Gables, for appellees/cross appellants Michael D. Stary, D.O., and Professional Emergency Services, Inc.
Bambi G. Blum and Ila J. Klion of Hicks, Anderson & Blum, P.A., Miami, and George, Hartz, Lundeen, Flagg & Fulmer, P.A., Fort Lauderdale, for appellees/cross-appellants Miguel Calzadilla, M.D. and Miguel Calzadilla, M.D., P.A.
Michael C. Mattson, Eugene K. Pettis, and Pamela R. Kittrell of Cooney, Haliczer, Mattson, Lance, Blackburn, Pettis & Richards, P.A., Fort Lauderdale, for appellee/cross-appellant Humana of Florida, Inc.
Shelley H. Leinicke of Wicker, Smith, Tutan, O'Hara, McCoy, Graham & Ford, P.A., Fort Lauderdale, for appellees/cross-appellants Yvonne Rutherford, M.D., P.A., Healthtrust, Inc.The Hospital Co., d/b/a Plantation General Hospital, Hospital Corporation of America, d/b/a Plantation General Hospital, Hospital Development & Service Corp., d/b/a Plantation General Hospital.
Philip D. Parrish of Stephens, Lynn, Klein & McNicholas, P.A., Miami, for appellees/cross-appellants Jack Kareff, M.D. and *1086 Jack Kareff, M.D. and Wayne Lee, M.D., P.A., d/b/a Physicians Associates.
Rehearing, Rehearing En Banc and Certification Denied February 18, 1998.
WARNER, Judge.
Appellants file this appeal from a defense verdict following a four month medical malpractice trial, claiming that the trial court committed five reversible errors. We find that two errors merit reversal. We hold that the trial court erred in admitting Child Protection Team reports of a child abuse investigation and in permitting the defense to cross examine the appellants' experts with non authoritative medical treatises. These errors were not harmless and consequently necessitate a new trial.
This case involved diametrically opposing views of the causation of the minor child's, Rayna's, injuries. The appellants sued three hospitals and nine doctors, alleging that they had committed medical negligence. The appellees steadfastly claimed that the baby was a victim of shaken baby syndromechild abuse. Over twenty-four expert physicians testified both in support of, and in opposition to, the views of each respective side, in addition to the eight appellee doctors, several lay witnesses, and the witnesses who testified on damages. In sum, it was a hotly contested trial.

Facts
On the morning of September 28, 1987, appellant Sharon Brock, the mother of six-month old Rayna, brought Rayna to Doctor's Hospital with complaints of a high fever, and appellee Doctors Gervasi and Stary examined her. After a general examination in which Dr. Stary observed some redness of the left ear drum, he diagnosed Rayna with otitis media (ear infection) and prescribed an antibiotic for her. He recorded that there were "no meningeal signs" but failed to perform a spinal tap to rule out meningitis, an ever present concern in the case of an infant having a very high temperature. The appellants' expert, Dr. Martin Raff, testified that Rayna had symptoms consistent with meningitis and that the emergency room doctors deviated from the standard of care by failing to perform a spinal tap, which would have definitively diagnosed whether she had meningitis. Dr. Raff opined that Rayna was suffering from meningitis and that giving her antibiotics created a condition called "partially treated meningitis," which masked the meningeal symptoms without curing the infection.
The next day, Ms. Brock brought Rayna to the offices of Pediatric Associates. She relayed the baby's symptoms and her treatment at Doctors' Hospital, including the diagnosis, and reported that Rayna had vomited after she received her second dose of antibiotics during the previous evening. Appellee Dr. Shulman found Rayna to be alert and cheerful. He concluded that she did not have otitis media and believed that her vomiting was due to a fairly common reaction to the antibiotic. After concluding that the baby had gastroenteritis or a stomach virus, and finding no signs of meningitis, he told Ms. Brock to discontinue the medication.
The next day, appellee Dr. Ohring examined Rayna when Ms. Brock brought her back to Pediatric Associates. After his examination, Dr. Ohring concurred with Dr. Shulman that the baby had a stomach virus, rather than an ear infection, and he also found no signs of meningitis.
As Rayna's health appeared to be improving, on Friday, October 2, 1987, Ms. Brock brought her to Lecia Tinsley, the babysitter, to spend the night so that Ms. Brock could go on a date. Ms. Tinsley noticed that the baby seemed a little warm and looked pale, but she did not think that she was too sick to be left for the evening. Ms. Tinsley gave Rayna Tylenol once and fed her three times. Rayna spit up once and had a little diarrhea.
Rayna slept through the night and into the next morning. After breakfast, Rayna fell asleep while playing on the floor. Ms. Tinsley was not alarmed at the time, and she put Rayna to bed. Later, when Ms. Tinsley checked on her, Rayna was limp as a rag and would not stir, but there was nothing unusual about her breathing. When Ms. Tinsley tried to reach Ms. Brock on the telephone to no avail, she decided to take the baby to the emergency room. Believing that she would not have the authority to take Rayna to the hospital, Ms. Tinsley stopped at Ms. Brock's *1087 home, which was on the way. She informed Ms. Brock that Rayna would not wake up and that she was taking her to the hospital. Ms. Brock went out to the car and checked on Rayna. Ms. Brock then got dressed and drove with Ms. Tinsley to the emergency room. Rayna was breathing, according to Ms. Tinsley, but Ms. Brock testified that at some point on the way to the hospital, Rayna started breathing "funny."

Humana Bennett
At approximately 1:13 p.m., Ms. Brock carried Rayna into Humana Hospital Bennett's emergency room. Within two minutes of her admission, Rayna suffered a "witnessed arrest," and a code blue was called. There is a significant dispute in the testimony as to when Rayna stopped breathing. Ms. Brock testified that she was still breathing when she entered the hospital, but defense experts testified that, based upon their review of the medical records and statements of Ms. Brock and Ms. Tinsley, the baby's breathing problems began much earlier in the morning. According to these experts, Rayna was either not breathing or had only one last breath when she arrived at Humana. The hospital records indicated "0" (zero) respirations on Rayna's admission. There is no question that the notation of the "0" was repeatedly written over a "6" in the same ink.
After she stopped breathing, Rayna's pulse dropped to 60 and her heart rate slowed down because of insufficient oxygen in the blood going to her heart and circulating through her body. Suspecting meningitis, appellee Dr. Kareff, an emergency room physician, began mouth-to-mouth resuscitation. Thereafter, Rayna was intubated, placed on a monitor, ventilated, and given intravenous fluids. Appellants' experts testified that all of these functions were unreasonably delayed or performed improperly, causing a substantial delay in the resuscitation efforts. Particularly, many of the experts testified that the doctors improperly placed the endotracheal tube, which would have helped Rayna breathe and provide oxygen to her brain, thereby causing her to become hypoxic and resulting in her brain injury. The defense experts all testified that the resuscitation efforts were all within the standard of care and that the tests showed that the baby was getting sufficient blood to her brain to survive.
At about 2:00 p.m. Dr. Kareff phoned the on-call pediatrician, appellee Dr. Calzadilla, to examine Rayna. Based upon Rayna's medical history, Dr. Calzadilla made a preliminary diagnosis of meningitis and prescribed antibiotics for her. The antibiotics were not administered until Dr. Calzadilla arrived about a half hour later. Upon his examination of Rayna, Dr. Calzadilla observed that her left pupil was dilated and her right pupil was constricted. He stated that he could not perform a full ophthalmologic examination. He also did not perform a spinal tap to confirm the existence of meningitis.
Shortly after Dr. Calzadilla arrived, Rayna began to convulse, and the doctor administered phenobarbital to calm her and sodium bicarbonate to combat her profound metabolic acidosis. He then called appellee Dr. Rutherford, head of pediatric intensive care at both appellee Plantation General Hospital and Memorial Hospital, and requested Rayna's transfer to a hospital with a pediatric intensive care unit. Dr. Calzadilla sent an ambulance over to Plantation Hospital to pick up Dr. Rutherford.
The appellants' experts testified that Dr. Calzadilla deviated from the standard of care by failing to respond to the hospital quickly enough, but defense experts contradicted this testimony. There was also substantial testimony from appellants' experts that he failed to timely establish an IV, which contributed to Rayna's brain damage; failed to do a spinal tap to confirm the existence of meningitis; and failed to examine Rayna's eyes with an ophthalmoscope. Several experts countered this testimony by stating that Dr. Calzadilla had met all standards of care and that his failure to perform a spinal tap did not damage the baby, because he had prescribed the appropriate drugs for treatment in any event. The defense experts further stated that if Dr. Calzadilla had performed a more thorough eye examination, this would not have modified the treatment administered.

*1088 Plantation General Hospital
Dr. Rutherford arrived at the Humana emergency room, examined Rayna, and spoke with her family. She was unable to examine the baby's eyes with an ophthalmoscope because of the constriction of her pupils. She reinstalled the IV and left with Rayna at 3:50 p.m. for Plantation General. At that time, she made a preliminary diagnosis of meningitis.
According to the admissions record at Plantation General, Rayna was admitted with a primary diagnosis of meningitis and a secondary diagnosis of subdural hematoma. Dr. Rutherford ordered a CT scan and long bone x-rays of Rayna. The radiology department reported to Dr. Rutherford that Rayna's CT scan indicated an acute subdural hematomaa collection of blood in the subdural area of the brainand that her x-rays showed a fracture of her femur in the growing portion of the bone. Dr. Rutherford was also able to complete Rayna's optical examination with an ophthalmoscope and determined that Rayna had a left retinal hemorrhage. The appellants' experts testified that the aggressive resuscitative efforts at Humana had likely caused retinal hemorrhage. On the other hand, the defense experts testified that child abuse caused this hemorrhage.

Memorial Hospital
In order to obtain a neurological opinion on whether to remove Rayna's subdural hematoma, Dr. Rutherford transferred Rayna to Memorial Hospital. Dr. Guilianti, a neurosurgeon, and Dr. Rutherford both viewed the films and diagnosed that the cause of Rayna's injuries was shaken baby syndrome, or child abuse. Dr. Rutherford reported this conclusion to the police at once.
The next day, the radiology department took additional CT scans of Rayna. The portion of her brain with the hematoma was considerably swollen, but the hematoma appeared smaller. Rayna received mannitol to reduce the swelling, but she had already sustained substantial brain damage. Upon performing a subdural tap three weeks later, the doctors learned that Rayna did not have a subdural collection of fluid any longer. She was discharged from the hospital on November 4th, and remains a spastic quadriplegic.
The two sides presented drastically different versions of the cause of Rayna's injuries. Appellants' experts testified that Rayna had meningitis from the time she appeared at Doctor's Hospital; that the doctors partially treated her meningitis by prescribing antibiotics; that her condition developed into fulminating meningitis by October 3,1987, when she went into respiratory arrest at Humana Bennett; and that improper resuscitation caused hypoxia ischemia, which resulted in her massive permanent brain damage. Some of the experts interpreted the CT scans as showing a subdural effusion caused by meningitis, rather than a hematoma. Some experts testified that meningitis rarely causes hematomas. They also testified that either meningitis or resuscitative efforts could cause retinal hemorrhages. The appellants' experts admitted that while the usual pattern was to have bilateral presentment of such symptoms, it was possible to have one-sided manifestations.
The defense experts uniformly agreed that Rayna was a victim of child abuse. They opined that Rayna had suffered shaken baby syndrome prior to her admission to Humana Hospital Bennett and that this trauma caused her brain damage. They testified that she did not have symptoms of, or suffer from, meningitis. Most of the experts testified that the brain symptoms from meningitis would have presented themselves bilaterally, rather than solely on one side. However, they also admitted that a baby's injuries to the brain from shaken baby syndrome usually presented themselves bilaterally, as did retinal hemorrhages.
We cannot possibly recite all of the detailed and extensive testimony contained in the 9,000 pages of transcript provided to us. Suffice it to say, the experts on both sides were matched opinion for opinion. They left no part of this baby's course of treatment untouched. Of significance in this appeal, the jury also heard testimony from the person in charge of the HRS Child Protection Team, which investigated the case. She testified that the team had initially concluded that Rayna was the victim of child abuse and had recommended such a finding, but that *1089 HRS' final conclusion in the case was that the child abuse charge was unfounded. Moreover, the baby did not exhibit any marks, bruises, or other external markings of abuse. Ms. Brock, Ms. Tinsley, and Ms. Tinsley's boyfriend each testified adamantly that they had never harmed Rayna. However, Ms. Brock made several contradictory statements as to the sequence of events that took place during the week between the Doctor's Hospital treatment and Rayna's admission to Memorial Hospital.
After four months of testimony, heavily interspersed with recesses while the lawyers argued vehemently about anything and everything, hundreds of trial exhibits, and two days of closing argument, the jury returned a verdict finding no negligence on the part of any of the appellees. The appellants appeal the judgment entered in favor of appellees.

Admission of HRS Reports
We find the most significant point for reversal is the appellants' claim that the trial court erred in admitting the recommendations of the Child Protection Team and the testimony of Child Protection Team members, contrary to sections 415.51 and 415.5055, Florida Statutes (1993). In 1990, the trial court ruled that the HRS records were discoverable, but granted access only to the appellees' experts. On petition for certiorari to our court, we determined that the petitioners failed to establish a departure from the essential requirements of the law, specifically noting that the judge had made no rulings on the admissibility of the records. See Myron v. Doctors Gen., Ltd., 571 So.2d 591 (Fla. 4th DCA 1990). Subsequent thereto, the legislature amended section 415.51, Florida Statutes (Supp.1990), and our court decided Cebrian v. Klein, 614 So.2d 1209 (Fla. 4th DCA 1993), in which we interpreted the amended statute and held that unfounded reports in child abuse investigations were inadmissible in a private negligence action and were entitled to protection under this statute. Accord Baker v. Eckerd Corp., 697 So.2d 970 (Fla. 2d DCA 1997). Although there is language in section 415.51(10) granting authority to the court to order disclosure of such documents, this language does not override the separate privacy protections in the statute for unfounded reports.
In July of 1993, HRS moved to quash a subpoena for HRS records on the ground that the investigation of alleged child abuse of Rayna had been classified as unfounded, and that Cebrian precluded disclosure of all unfounded reports. The appellees then moved to dismiss the complaint, pursuant to section 90.510, Florida Statutes (1993), which states, in pertinent part:
In any civil case or proceeding in which a party claims a privilege as to a communication necessary to an adverse party, the court, upon motion, may dismiss the claim for relief or the affirmative defense to which the privileged testimony would relate.
The appellees claimed that they needed access to the reports of the Child Protection Team to perfect their defense that Rayna had been the victim of child abuse. At the hearing on the issue, HRS continued to maintain that the records were confidential and privileged under Cebrian. Nevertheless, the trial court gave the appellants a choice: either waive the privilege or have the suit dismissed. Faced with this ultimatum, the appellants' attorneys executed a waiver of the privilege. The appellees received the records but the appellants continued to maintain their position that the records and testimony were inadmissible under section 415.51.
Section 415.51(2), Florida Statutes (Supp.1990), provided protection from disclosure for any "unfounded" reports of child abuse.[1] The Legislature enacted this provision in 1990, and it remained unchanged until *1090 the Legislature amended it again in 1995. See Baker v. Eckerd Corp., 697 So.2d 970 (Fla. 2d DCA 1997). The 1990 statute was in effect for purposes of the issues in this case. See Cebrian, 614 So.2d at 1212. The supreme court has also determined that the 1990 statute requires confidentiality of these reports:
It is clear that the child protection statutes at issue here were designed to reconcile the competing concerns of the state in cases of this type. Because of the severe harm that child abuse causes to society and the ease with which it is concealed, the state has a pressing and overriding need to investigate alleged child abuse even in cases like this one that later may prove to be unfounded. Yet, because even anonymous or baseless allegations can trigger such an investigation, the state has sought to accommodate the privacy rights of those involved. It has done so by providing that the supposed victims, their families, and the accused should not be subjected to public scrutiny at least during the initial stages of an investigation, before probable cause has been found. Such confidentiality is consistent with Florida's strong protection of privacy rights. Art. I, § 23, Fla. Const.
Times Pub. Co. v. A.J., 626 So.2d 1314, 1315 (Fla.1993).
The statute in effect at the time stated:
(2) Access to such records ... shall depend on the classification of the report, and shall be granted only to the following persons, officials, and agencies. Access to unfounded reports shall be limited to the persons and for the purposes stated in paragraphs (a), (b), (c), (g), and (l).
§ 415.51(2), Fla. Stat. (1993). Paragraph (a) included employees or agents of the department responsible for carrying out the investigation; (b) included law enforcement agencies investigating reports of abuse; (c) included the state attorney; (g) included officials of the department responsible for administration of the department's program for the prevention, investigation, or treatment of child abuse; and (l) included officials of the human rights advocacy committee or the guardian ad litem for the child. See § 415.51, Fla. Stat. (1993). Significantly, even though the child, perpetrator, or parents could obtain access to a "proposed confirmed" or confirmed report, they had no access to unfounded reports. Moreover, although subsection (e) granted a court access "upon its finding that access to such records may be necessary for the determination of an issue before the court," that section applied only to proposed confirmed reports, confirmed reports, or reports closed without classification. In other words, even a court was denied access to unfounded reports. Because the report was unavailable to anyone except the department and law enforcement agencies, the appellants had no "privilege" against disclosure which they could waive. They had no right to disclosure of the report to themselves, and even if they did waive disclosure, the court could not order the production of an unfounded report. See Times Pub. Co., 626 So.2d at 1316. Thus, the court erred in ordering its release to the appellees.[2]
Having established that the Child Protection Team report was confidential and was exempt from disclosure, even from the courts and the parents, section 90.510 does not alter this result. Section 90.508, Florida Statutes (1993), provides, in pertinent part:
Evidence of a statement or other disclosure of privileged matter is inadmissible against the holder of the privilege if the statement or disclosure was compelled erroneously by the court....
In the instant case, the trial court required the appellants to either waive the "privilege" or lose the lawsuit. However, as we have explained, neither the court nor the parents could require production of the report. Moreover, even if we were to assume that the appellants' waiver of the "privilege" could result in the lawful release of the report, we find this waiver to be involuntary. The appellants were faced with the choice of seeing their lawsuit dismissed and chancing a reversal *1091 on appeal or executing a waiver. Where the trial court erroneously compels such a choice, there is no voluntary waiver by the appellants. See Florida House of Representatives v. United States Dep't of Commerce, 961 F.2d 941, 946 (11th Cir.), cert. dismissed, 506 U.S. 969, 113 S.Ct. 446, 121 L.Ed.2d 363 (1992).
Our prior decisions on the two certiorari petitions filed in this court do not change our result. We made the first decision in 1990, which was prior to the amendment of the statute on access to HRS abuse reports. See Myron, 571 So.2d at 591. Our simple denial of the second petition without opinion did not establish the law of the case because such a denial could not be construed as a determination on the merits. See Bared & Co. v. McGuire, 670 So.2d 153, 158 (Fla. 4th DCA 1996).[3]
Finally, the appellees contend that the appellants "opened the door" to admission of the Child Protection Team report by preemptively admitting a letter from HRS to Rayna's mother reporting that the investigation was closed as "unfounded."[4] The letter revealed no other details of the investigation. The appellants introduced this letter after the trial court once again denied the motion in limine to prevent the admission of the Child Protection Team report. We consider that the appellants' introduction of this letter was in the nature of anticipatory rehabilitation to "soften the blow" of anticipated inquiries or revelations expected to be damaging to the credibility of the witness. See Bell v. State, 491 So.2d 537, 538 (Fla.1986). As the entire defense theory was that child abuse was the cause of the baby's injuries, most likely inflicted by the mother, the introduction of the "unfounded" letter from HRS did not constitute positive evidence on the plaintiff's theory, but instead served to negate the defense theory. Similarly, in Webb v. Priest, 413 So.2d 43 (Fla. 3d DCA 1982), the third district determined that an attempt to minimize the injury caused by the admission of improper evidence did not result in a waiver of the issue of the erroneous admission of the evidence on appeal. We distinguish Vann v. American Motorists Insurance Co., 627 So.2d 601 (Fla. 3d DCA 1993) and Ryder Truck Rental, Inc. v. Johnson, 466 So.2d 1240 (Fla. 1st DCA 1985). In both of these cases the courts held that, where the appellants had introduced evidence during their case, which "opened the door" for the defendants to offer otherwise inadmissible evidence, they effectively waived their right to complain about error in the introduction of such defense evidence. However, in these cases, the evidence which the appellants introduced during their cases in chief was an integral part of their claims, rather than responses to defense evidence.
In the instant case, the evidence which indicated that HRS had found child abuse present could hardly be deemed harmless. Because this conclusion was based on HRS' own doctor's examination of the radiographic evidence of Rayna's brain, it, in effect, amounted to a state endorsement of the opinions of the defense experts regarding the interpretation of those films. We reject the argument of the appellees that the exclusion of this evidence would somehow hamper the search for the truth in this case for that reason. The Child Protection Team doctor's testimony amounted to nothing more than an additional defense expert's opinion as to the interpretation of the brain films. The social worker in charge of the file also testified, but offered no information other than the fact that she had gathered the medical reports and had interviewed the mother and the babysitter. She testified that HRS' investigation was closed within a few weeks of the incident but that they suspected child abuse by the mother. Yet, she never offered any reason, either in testimony or in the Child Protection Team report, which was erroneously admitted into evidence, for her suspicion of abuse, other than the radiographic evidence of Rayna's brain. Thus, the exclusion of the HRS records would not "hide the *1092 truth" from the jury. The question of whether the baby suffered from abuse or not rested on the interpretation of the CT scans of her brain which were exhaustively reviewed by a host of other experts on both sides.

Cross-Examination Using Medical Texts
Appellants also complained that the appellees cross-examined several of the appellants' expert witnesses with medical literature that the experts did not deem authoritative. In addition, the trial court expressly refused to find that the literature was authoritative. The appellees did not try to offer other evidence of the literature's authoritativeness. Section 90.706, Florida Statutes (1993), provides:
Statements of facts or opinions on a subject of science ... contained in a published treatise, periodical, book ... or other writing may be used in cross-examination of an expert witness if the expert witness recognizes the author or the treatise, periodical, book ... or other writing to be authoritative, or, notwithstanding nonrecognition by the expert witness, if the trial court finds the author or the treatise ... to be authoritative and relevant to the subject matter.
In Chesterton v. Fisher, 655 So.2d 170 (Fla. 3d DCA 1995), the appellate court stated that if the cross-examined expert does not recognize a treatise as authoritative, the burden to prove the authoritativeness is on the party offering the treatise.[5] Here, the treatises should not have been used in cross-examination unless either the expert or the trial court recognized their authoritativeness. Since neither did, it was error to permit cross-examination using the treatises.
We cannot find that this was harmless error. As we have said before, the parties' expert testimony was the focal point of this trial. Each set of experts had extensive credentials in their respective fields and offered reasonable explanations for their opinions. Thus, any attack on these experts was extremely important.
Our reversal of the case eliminates the necessity to address the issue of the introduction of surprise demonstrative evidence. We find no abuse of discretion as to the remaining evidentiary issues.
On cross-appeal, Dr. Calzadilla, the pediatrician, argues that he was entitled to a directed verdict on the claim that he was negligent in failing to perform a spinal tap on Rayna. The appellees claimed that the doctor was negligent in failing to perform a spinal tap to diagnose meningitis. However, the evidence presented by their experts showed that, despite the lack of a spinal tap, Dr. Calzadilla prescribed the appropriate antibiotics to treat meningitis. In fact, both Dr. Raff and Dr. Calcagno, two of the cross appellees' experts, testified that the prescribed antibiotics were the appropriate treatment for meningitis. Therefore, we agree with Dr. Calzadilla that the trial court should have directed a verdict in his favor on this issue. There was no evidence that his failure to diagnose meningitis caused injury to Rayna, because he treated her as though she had the infection and prescribed appropriate medications to combat it.
Dr. Rutherford also contends that the court's jury instruction on apparent agency as to her relationship with the hospitals was incorrect. As the appellants concede this point, the parties can correct the instruction on retrial.
Finally, we feel compelled to comment on the lawyers' conduct in this trial. The trial lawyers on this case are all highly professional, skilled lawyers with excellent reputations. Yet, from reading this entire transcript, we cannot help but cringe at the exchanges between them and with the court. The argument, both in front of the jury and at sidebar, reflected a disrespect of each other and exasperation with the proceedings. Even the trial court commented several times that things were getting way out of hand. At one point, after heated argument, the court said, "[y]ou know, the public is here. There are members of the public here who have not been perhaps associated with this.... Let's *1093 keep it a profession, if we could please." Even the clients got involved in this atmosphere, as evidenced by the fact that the appellants' counsel had to ask the court to admonish one of the doctors not to make faces at the mother.
It is understandable that emotions ran high during this trial. After all, the appellants were attacking the professional competence of many doctors, something that directly affected their respective livelihoods. On the other hand, the defense was claiming that Rayna was the victim of child abuse by her mother. Nevertheless, in such a charged atmosphere, the lawyers should not aggravate the tensions themselves by letting their emotions get the best of them. We hope on the retrial of this action, the lawyers will take this to heart and conduct themselves accordingly.
Reversed and remanded for a new trial.
STONE, C.J., and STEVENSON, J., concur.
NOTES
[1] The appellees also argue that there is no absolute privilege as to Child Protection Reports, citing sections 415.5055(3) and 415.51(11), Florida Statutes (1991). However, these sections must be read in pari materia with the remainder of section 415.51, and we agree with the appellants' arguments that because the statute excludes access to the entire unfounded HRS report, that necessarily includes the Child Protection Team report. It would make little sense to prevent disclosure of the HRS report but to permit disclosure of the Child Protection Team report or allow testimony as to the contents of the report which forms the basis of the HRS report.
[2] Even though they could not seek disclosure, the parents had standing to assert the statutory confidentiality. See Times Pub. Co., 626 So.2d at 1315-16.
[3] We have also determined that when we find that the petitioner has not made a sufficient showing of irreparable harm or injury, we will enter an order dismissing the petition. See Bared, 670 So.2d at 157 (emphasis in original).
[4] As we are holding that the report is not admissible, the HRS letter would not be independently admissible on retrial.
[5] Appellees point out that some of the texts were written by the experts who testified. However, simply because a person is accepted as an expert does not mean that other experts consider that the opinions expressed by that expert are authoritative.